UNITED STATES ex rel. Ronald H.
DAVIS, Plaintiff,

v.

LONG'S DRUGS, INC., a corporation,
et al., Defendants.

Civ. No. 75–1069–E.

United States District Court,
S. D. California,
Civil Division.

March 16, 1976.

As Amended June 1, 1976.

Barton M. Myerson, Jones, Hatfield, Penfield & Garrett, Escondido, Cal., for plaintiff.

Lawrence E. Volmert, Howard H. Bell, Dunlavey, Rosenberg & Miles, Oakland, Cal., David A. Block, Stephen P. Oggel, Sullivan, Jones & Archer, E. Mac Amos, Jr., Holt, Rhodes & Hollywood, San Diego, Cal., Arthur London, Green & Green, Los Angeles, Cal., for defendants.

## OPINION

ENRIGHT, District Judge.

This case presents the question of whether claims presented to a state agency in accord with the Federal Medicaid program, 42 U.S.C. § 1396 et seq., are claims against the United States government within the meaning of the Federal False Claims Act, 31 U.S.C. § 231 et seq. The instant action is brought by a private individual, Ronald H. Davis, on behalf of the United States government under the Federal False Claims Act to recover for alleged fraudulent claims submitted by defendants under the state Medicaid program popularly known as MediCal. (California Welfare and Institutions Code section 14000 et seq.) The jurisdiction of this court is predicated upon 31 U.S.C. § 232(A). The United States government has declined participation in this litigation. (See 31 U.S.C. § 232(C)).

Defendants Value Fair, Inc., Long's Drug Stores, Inc., MacDonald's Pharmacies, Inc., and Sav-On Drugs, Inc. have moved to dismiss the complaint pursuant to Federal

Rule of Civil Procedure 12(b) for failure to state a claim asserting that the alleged fraudulent claims here are not claims against the government within the meaning of the False Claims Act. The defendants also move to dismiss for lack of subject matter jurisdiction arguing that this action is barred by 31 U.S.C. § 232(C) which prohibits private False Claims Act suits where the information upon which the plaintiff relies is already in the possession of the government. The defendants also move to strike Doe allegations in the complaint and alternatively, if their motions to dismiss are not granted, for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e). For the reasons set forth below the defendants' motions to dismiss will be denied, defendants' motions to strike Doe allegations will be granted, and defendants' motions for more definite statement will be taken under submission pending plaintiff's filing of an amended complaint.

Prior to assessing the legal merits of the parties' positions, a brief discussion by way of background as to the various statutory enactments at issue here would appear in order. In 1965, Congress enacted "Medicaid" to provide grants to states for medical assistance programs to aid indigents, 42 U.S.C. § 1396 et seq. In the same year, Congress passed an unrelated program to provide health insurance benefits for the aged and disabled known as "Medicare", 42 U.S.C. § 1395 et seq. In response to the Medicaid Act, the California legislature at the 1965 second extraordinary session passed the California "MediCal" program. (See *Morris v. Williams,* 67 Cal.2d 733, 738, 63 Cal.Rptr. 689, 433 P.2d 697 (1967)).

> " 'Medi-Cal' is this state's program enacted pursuant to the federal law. In order to obtain federal funding which became available to the states under [Medicaid] the Legislature enacted what is commonly known as the 'Medi-Cal Act.' " *California Medical Assn. v. Brian,* 30 Cal. App.3d 637, 642, 106 Cal.Rptr. 555, 558 (1973).

Approximately 50% of MediCal funds originate with the federal government. (See 42 U.S.C. §§ 1396b(a)1 and 1396d(b) for the method of computation.) To qualify for federal funding through the Medicaid program a state plan must comply with extensive federal regulations. (See discussion *infra*). If these regulations are not complied with, the Secretary of Health, Education and Welfare is empowered to cut off all or part of the federal funds for the state program. (See 42 U.S.C. § 1396c).

The Federal False Claims Act, 31 U.S.C. § 231 et seq., under which this suit is brought, is a civil statute designed to protect the United States Treasury from fraudulent claims. A related enactment, 18 U.S.C. § 287, specifies criminal penalties for whomever makes or causes to be made false claims against the United States. (See *United States v. Neifert-White,* 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) at n. 1). The civil False Claims Act, 31 U.S.C. § 231 et seq., provides that persons who submit false claims "shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act . . . ." Private parties as "informers" are given a private right of action under the False Claims Act; they must, however, immediately after commencing suit provide the Attorney General with a copy of the complaint and "a disclosure in writing of substantially all evidence and information in [their] possession material to the effective prosecution of such suit." (31 U.S.C. § 232(C)). The government then has 60 days within which to enter the suit, and if the government declines, the plaintiff informer may carry on such suit. (31 U.S.C. § 232(C)). Section 31 U.S.C. § 232(E)2 provides that the plaintiff informer is entitled to fair and reasonable compensation not to exceed one-fourth of the total recovery for his information and actions in prosecuting the action.

The plaintiff in the instant case, Ronald H. Davis, asserts that while working as a pharmacist for the various defendants he observed defendants submit numerous false and fraudulent claims for prescription drugs under the California MediCal program. The plaintiff claims that the infor-

mation upon which this suit is based was not previously in the possession of the United States. The defendants assert that the plaintiff does not possess any new information and this suit is without factual foundation. Any challenge though by defendants to the merits of plaintiff's contentions regarding the submission of fraudulent claims should be resolved on a Federal Rule of Civil Procedure 56 motion for summary judgment. The essence of the instant motions is that the plaintiff has failed to state a claim upon which relief can be granted in that claims for MediCal benefits are not claims against the United States government within the meaning of the False Claims Act, 31 U.S.C. § 231 et seq.

## MEDICAL CLAIMS AS CLAIMS AGAINST THE UNITED STATES GOVERNMENT

The defendants argue that the mere fact that federal funds are advanced for a state program is insufficient to warrant a characterization of fraudulent claims under that program as claims against the United States government within the meaning of the False Claims Act. It is the defendants' position that MediCal is an entirely state administered program which is only funded in part by the federal government and under these circumstances the United States does not possess sufficient connection with MediCal to warrant characterizing false MediCal claims as claims against the United States government. The defendants rely on the Supreme Court companion cases of *Rainwater v. United States,* 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958), and *United States v. McNinch,* 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958), and the Ninth Circuit opinion in *United States v. Howell,* 318 F.2d 162 (9th Cir. 1963), as support for the proposition that the False Claims Act should be strictly construed. The *Rainwater* decision, however, is not favorable to the defendants. In that case the Court held that false claims regarding crop loans made to the Commodity Credit Corporation, a wholly owned government corporation, were cognizable as claims "against the Government of the United States." The Court stated,

"It seems quite clear that the objective of Congress was broadly to protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims were made. Cf. *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 544–545, 63 S.Ct. 379, 87 L.Ed. 443." 356 U.S. at 592, 78 S.Ct. at 948, 2 L.Ed.2d at 999.

The *McNinch* case involved false representations made in obtaining FHA guarantees of housing loans made to defendants by a bank. The Court noted "the problem is not easy" but an application for credit insurance under the FHA program was not a "claim" within the meaning of the False Claims Act. The Court stated,

"Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible to numerous definitions. See *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443." 356 U.S. at 598, 78 S.Ct. at 952, 2 L.Ed.2d at 1004.

The Ninth Circuit *Howell* case was another civil action under 31 U.S.C. § 231. The defendants held a concession for military dry cleaning business through the Bay Area Exchange whereby they were to pay to the Exchange a percentage of their gross receipts. They misrepresented these receipts and the court held that this was not a "claim" against the government within the meaning of the Act.

Although the California MediCal program is administered by a state agency, this program and all state programs which qualify for federal Medicaid funds have substantial contacts with the federal government. As indicated above, MediCal was apparently enacted so that California could qualify for federal Medicaid funds. (See *California Medical Assn. v. Brian,* 30 Cal.App.3d 637, 642, 106 Cal.Rptr. 555 (1973), California Welfare and Institutions Code sections 14003, 14019, 14053(14) and (17)). Disbursements to state medical assistance programs through Medicaid are subject to a myriad of

federal regulations. (See generally 42 U.S.C. §§ 1396a, 1396c, and 45 C.F.R. 249.10 et seq.) For example, section 1396a(4) and (5) of the Medicaid Act define numerous requirements for the internal structure of a qualifying state medical assistance program. Section 1396a(6) provides that the state agency "will make such reports, in such form and containing such information, as the Secretary [of Health, Education and Welfare] may from time to time require . . . ." Numerous federal Medicaid requirements are directed to the problem of the submission of claims through the state medical assistance agency. Section 42 U.S.C. § 1396a(23) requires that a state plan must "provide that any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service . . . who undertakes to provide him such services;" Section 42 U.S.C. § 1396a(27) requires that a state plan must include agreements, with all persons who provide services to individuals covered by the plan, which insure that such records are kept "as are necessary fully to disclose the extent of the services provided . . . ." Section 42 U.S.C. § 1396a(30) requires that a state plan must provide "such methods and procedures . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments (including payments for any drugs provided under the plan) are not in excess of reasonable charges consistent with efficiency, economy, and quality of care." Section 45 C.F.R. 250.80(a)5(i) requires that claims forms for claims submitted to the state agency be imprinted in boldface type with the following statement: "I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws." Finally, 45 C.F.R. § 250.30(b)2 sets upper limits for the price charged for prescription drugs in accord with specific standards but in no event to exceed the provider's usual and customary charge to the general public. As noted earlier, the Secretary of Health, Education and Welfare has the authority to withhold federal funds in whole or part from any state program which is not in compliance with the numerous requirements of the Medicaid Act. (42 U.S.C. § 1396c).

Further evidence that the federal government has significant contacts with claims submitted under state Medicaid programs is given by the fact that Congress has made it a crime to submit false Medicaid claims. "Whoever (1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a State plan approved under this subchapter . . . shall be guilty of a misdemeanor . . . ." 42 U.S.C. § 1396h.

It is difficult to perceive why false Medicaid claims, where 50% of the funds originate with the federal government, should not constitute claims against the United States when Congress has seen fit to designate the same conduct as· a federal crime.

The existence of extensive federal regulations governing state Medicaid programs is persuasive evidence that claims filed under the state program should be considered claims against the United States within the meaning of the False Claims Act. Recent Supreme Court decisions, namely *United States v. Neifert-White*, 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) and *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514, 44 Law Week 4078 (1976), as well as the leading Supreme Court case under the False Claims Act, *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), indicate that the False Claims Act should be liberally construed. In *Neifert-White* it was held that a dealer who sold grain bins to farmers and then provided false invoices which were used in support of applications to the government Commodity Credit Corporation was liable under the False Claims Act. The Court stated,

"In the various contexts in which questions of the proper construction of the Act have been presented, the Court has consistently refused to accept a rigid, restrictive reading, even at the time when the statute imposed criminal sanctions as well as civil. See, e. g., *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943)." 390 U.S. at 232, 88 S.Ct. at 961, 19 L.Ed.2d at 1065. In the very recent case of *United States v. Bornstein,* the Supreme Court again declined to take a restrictive interpretation of the Act and held that a subcontractor who misrepresented that electronic tubes were of a certain quality was liable for a false claim submitted by the prime contractor. The Court stated,

"It is settled that the Act permits recovery of multiple forfeitures and that it gives the United States a cause of action against a subcontractor who causes a prime contractor to submit a false claim to the government. See *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443." 423 U.S. at 309, 96 S.Ct. at 528, 46 L.Ed.2d at 521, 44 Law Week at 4079–80.

The case of *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), which has been cited with approval in all subsequent False Claims Act decisions by the Supreme Court, is the closest factually to our case. In the *Hess* case the defendants were charged with rigging electrical bids for contracts with local municipalities and school districts in Allegheny County, Pennsylvania. The money for the contracts originated in substantial part with the federal Public Works Administration, with the balance provided from local funds. After noting specific requirements that the local contracting agency had to comply with in order to qualify for federal funds, (exactly as with Medicaid) the Supreme Court held that the defendants were liable for violating the False Claims Act as the purpose of the Act was,

". . . to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." 317 U.S. at 544–545, 63 S.Ct. at 384, 87 L.Ed. at 449.

The money which was paid to defendants originated from a joint account containing both federal and local funds. The Court stated,

"The government's money would never have been placed in the joint fund for payment to respondents had its agents known the bids were collusive. By their conduct, the respondents thus caused the government to pay claims of the local sponsors in order that they might in turn pay respondents under contracts found to have been executed as the result of the fraudulent bidding. This fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the P. W. A. into the joint fund for the benefit of respondents. The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal— payment of government money to persons who had caused it to be defrauded.

Government money is as truly expended whether by checks drawn directly against the Treasury to the ultimate recipient or by grants in aid to states." 317 U.S. at 543–544, 63 S.Ct. at 384, 87 L.Ed. at 449.

This court is convinced that *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943) is controlling authority here. Even more extensive federal controls are evident here with Medicaid than with the Public Works Administration program at issue in the *Hess* case. Also, the claim requirement which has troubled some courts in this area, see e. g., *United States v. Howell,* 318 F.2d 162 (9th Cir. 1963), is clearly met here by direct money claims submitted to MediCal, as it was by collusive bidding in the *Hess* case. The instant case involves indirect claims submitted through MediCal, a situation which is essentially indistinguishable from the bids submitted to the local contracting agencies which were found to be claims against the United States in the *Hess* case.

This court also finds persuasive two recent circuit court opinions which held that false claims submitted through Medicare, 42 U.S.C. § 1395 et seq., constituted claims against the United States: *Peterson v. Weinberger*, 508 F.2d 45 (5th Cir. 1975) and *United States v. Catena,* 500 F.2d 1319 (3rd Cir. 1974). Under the Medicare program, specified private insurance companies are empowered to process and pay Medicare claims in return for federal reimbursement for claims paid and administrative costs. In *Peterson v. Weinberger,* the Fifth Circuit found liability under the False Claims Act, 31 U.S.C. § 231 et seq., against a physician for submitting fraudulent Medicare claims to an insurance company intermediary. The court adopted a liberal interpretation of the Act, citing *United States v. Neifert-White,* 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) and *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). (508 F.2d at 52). *United States v. Catena* involved a criminal prosecution under 18 U.S.C. § 287 against a physician for submitting false Medicare claims to an insurance intermediary. The Third Circuit sustained the conviction on the ground that the defendant "caused" the insurance carriers to submit false claims to the United States government.

This court concludes based on the extensive federal regulations governing state Medicaid plans and on the authority of *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 40, 87 L.Ed. 498 (1943), that alleged false claims submitted to a state Medicaid program, such as MediCal, are claims against the United States within the meaning of the False Claims Act. Accordingly, defendants' motions to dismiss will be denied.

### INFORMATION PREVIOUSLY IN POSSESSION OF UNITED STATES GOVERNMENT

The defendants have also moved here to dismiss under Federal Rule of Civil Procedure 12(b) for lack of subject matter jurisdiction. The defendants argue, based on section 232(C) of the False Claims Act, that the information upon which this suit is based was already in the hands of an "agency" of the United States at the time suit was filed and therefore this court lacks jurisdiction. Section 232(C) provides in part:

"The court shall have no jurisdiction to proceed . . . whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought . . . ."

31 U.S.C. § 232(C).

The defendants claim that the State of California was already in possession of the information upon which this suit is based by virtue of an earlier lawsuit involving substantially the same defendants as the instant action. Although this earlier suit, *Johnson v. California Physicians Service, et al.,* 646–651, Superior Court, County of San Francisco (1972), did not directly involve plaintiff-relator herein Ronald Davis, apparently the information upon which the suit was based was supplied by Mr. Davis and is essentially the same information as that upon which the instant action is premised. A demurrer by the State of California was sustained in the *Johnson* suit and the Attorney General indicated that his office was currently investigating the false MediCal claims alleged in the suit. No action was ever filed though as to these claims by the Attorney General and the *Johnson* suit was dismissed in its entirety on procedural grounds without any determination as to the merits of the alleged fraudulent claims.

The issue presented here, therefore, is whether the State of California acting through its MediCal program and Attorney General should be considered an "agency" of the United States within the meaning of the jurisdictional limitation of section 232(C) of the False Claims Act. For purposes of this determination it will be assumed that the State of California was in possession of a substantial percentage of the information upon which the instant suit is premised. Defendants argue that while there are no cases where a state or its agencies have been found to be an "agency" of the United States under 31 U.S.C. § 232(C) this court

should so find based on cases under the Federal Tort Claims Act (28 U.S.C. § 2674 et seq.) where the wrongful conduct of an "agent" was held to result in government liability based on general principles of agency law. (See *e.g., United States v. Becker,* 378 F.2d 319 (9th Cir. 1967)). The Tort Claims Act, however, is based on entirely different policy considerations than the False Claims Act and cases under the former are of little value in resolving questions as to the latter. The Tort Claims Act is designed to remove governmental immunity and provide compensation to persons injured by the negligence of the government acting through its officers (see *Rayonier v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957)), while the False Claims Act is designed to protect the government from fraudulent claims asserted by its citizens. (See *United States v. Neifert-White,* 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968)). The plausible arguments advanced here by defendants as to the applicability of general agency principles regarding the formation of the agent-principal relationship do not consider a subtle but important distinction. The question with which we are presented is not whether the State of California acting pursuant to its MediCal program is an "agent" of the federal government, all federal employees and many who deal with the government are "agents" of the United States, but whether the State of California by virtue of its participation in the Medicaid program is an "agency" of the United

States. It is only this latter designation, "agency", which is covered by the limiting language of section 232(C). None of the cases which have barred actions under section 232(C) have involved information previously in the possession of a state agency. Typical "agencies" have included such federal subdivisions as the United States Army Quartermaster Corps, the United States Army Signal Corps, the United States Justice Department, and the federal District of Columbia Public Utilities Commission.[1]

The defendants also argue that by determining that allegedly fraudulent state Medicaid claims are claims against the United States under 31 U.S.C. § 231, it would somehow be inconsistent for this court to not hold that prior disclosures to California state officials here will bar the instant suit according to the provisions of section 232(C) of the Act. This argument fails though to take into account the different policy considerations which underlie the principal liability section of the False Claims Act, section 231, and the limiting provision, section 232(C). Section 232(C) was enacted to bar parasitical suits where the plaintiff relies on information acquired from public records such as indictments or reports of legislative committees, while section 231 was designed to protect the United States Treasury from all manner of fradulent claims. After considering the report of the Senate Judiciary Committee[2] the court in *United States v. Anaconda Wire and Cable Co.,* 57 F.Supp. 106 (S.D.N.Y. 1944) noted that section 232(C) was added to the Act:[3]

---

1. *See United States v. Armour & Co.,* 146 F.Supp. 546 (D.C.1956) *aff'd,* 102 U.S.App.D.C. 391, 254 F.2d 90 (1958) Army Quartermaster Corps; *United States v. Anaconda Wire and Cable Co.,* 57 F.Supp. 106 (S.D.N.Y.1944) *aff'd,* 149 F.2d 680 (2d Cir. 1945) Army Signal Corps; *United States v. Aster,* 176 F.Supp. 208 (E.D. Pa.1959) *aff'd,* 275 F.2d 281 (3d Cir. 1959) United States Justice Department; *United States v. Potomac Power Co.,* 93 U.S.App.D.C. 108, 208 F.2d 39 (1953) D.C. Public Utilities Commission.

2. The Supreme Court in *United States v. Neifert-White,* 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) recently looked to the legislative history of the Act in deciding a False Claims case, thus indicating that the intent of

Congress in enacting section 232(C) is here a proper source of inquiry:

"The original False Claims Act was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War. Debates at the time suggest that the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government. 390 U.S. at 232, 88 S.Ct. at 961.

3. Another case decided shortly after the effective date of the section 232 amendment was *United States v. Pittman,* 151 F.2d 851 (5th Cir. 1945) where the court determined that the limiting language at issue here was designed only to bar suits by a relator and not those taken over by the United States. The court examined

". . . because of the experiences of the Department of Justice—'that many persons who have filed suits and may file suits under this section have no information or facts of their own, but prepare and file complaints which obviously are based on information and alleged facts obtained bodily from indictments returned in the United States Courts, from newspaper stories, and congressional investigations'." 57 F.Supp. at 107–108.

Of the decisions which have investigated the legislative history of section 232(C),[4] the most comprehensive analysis is found in *United States v. Westinghouse Electric Corp.*, 363 F.Supp. 1038 (W.D.Penn.1973). The court in *Westinghouse* stated:

"We have carefully examined 89 Congressional Record 10744–10752 and 10844–10846 and have endeavored to find some trace of an explanation of the language in question. It appears that there was originally a House bill which was designed practically to abolish informer suits. The Senate, however, did not agree with this, feeling that the False Claims Act permitting informer's suits which orginally had been enacted at the time of the Civil War at the urgent request of President Lincoln, who was disturbed at contractors robbing the country during its time of travail, served a useful purpose. However, as disclosed in the *Marcus* case and other incidents which were brought to light, it had become a · fertile field for activities of racketeers who would copy indictments or material

developed by a Senate Investigating Committee, bring an informer's suit and reap a bounteous harvest, the percentage at that time being fifty percent. The Senate took the position that the informer's suit served a useful purpose as long as racketeering was prevented and in the Senate Amendments for the first time appeared the language that the court should have no jurisdiction to proceed with any suit when it was made to appear that it was based upon evidence or information in the possession of the United States, etc., at the time the suit was brought. See 89 Congressional Record 10745."

363 F.Supp. at 1041–1042.

Congressman Walter, one of the House Managers, made the following statement as to the final form of the new amendment:

"We feel that by enacting this compromise legislation the United States will be amply protected and at the same time there will not be this ever-present invitation to racketeers to examine indictments, to examine reports of the Truman committee, or if you please, for dishonest and unscrupulous investigators to turn over information to their friends or co-conspirators for the purpose of bringing suit against our citizens on information that either comes to them *by reading an indictment or bill of complaint or through testimony before some committee or which comes to them in their official capacity* as a representative of the United States." (emphasis added)

the legislative history of the new amendment and noted that the limiting language was added to bar suits by relators based on non-original information:

"The Senate bill denied jurisdiction to the court to hear or try 'such suit brought or carried on by any person for himself and the United States' unless based on original evidence and information not in possession of the United States. . . ."
151 F.2d at 853.

4. *See* in addition to *United States v. Westinghouse Electric Corp.*, 363 F.Supp. 1038 (W.D.Pa. 1973), *United States v. Anaconda Wire and Cable Co.*, 57 F.Supp. 106 (S.D.N.Y.1944) *text accompanying note 2 supra*; *United States v. Pittman*, 151 F.2d 851 (5th Cir. 1945) *note 3*

*supra*; *United States v. Aster*, 176 F.Supp. 208 (E.D.Pa.1959); and *United States v. Armour & Co.*, 146 F.Supp. 546 (D.C.1956). In *United States v. Armour & Co.*, the court considered the applicability of section 232(C) to a case where the relator acquired the information in the course of her employment as a claims examiner in the office of the Quartermaster General of the United States Army. The court in *Armour* barred the action based on the limitation provision: "In addition, the statute on which relator relies for authority to bring her action has for its purpose, among others, the exclusion from its coverage of this type of claim, sometimes described as parasitical. This is demonstrated by its legislative history. . . ." 146 F.Supp. at 549.

363 F.Supp. at 1042 n.4.

It seems apparent that the purpose of Congress in enacting section 232(C) of the False Claims Act was to prevent parasitical suits where the relator attempts to base his action on non-original information already in the possession of the "United States, or any agency, officer or employee thereof."

Defendants emphasize here the case of *United States v. Aster,* 176 F.Supp. 208 (E.D.Pa.1959) aff'd, 275 F.2d 281 (3d Cir. 1959), where suit was barred under section 232(C) by virtue of information previously disclosed to the United States by the same False Claims Act plaintiff, in arguing that section 232(C) was designed to reach more than just those cases where plaintiff pirated his information from government sources. This court has serious reservations though as to the validity of the *Aster* decision in light of the above legislative history which indicates that Congress intended to eliminate only parasitical suits and the recent opinion of the Supreme Court in *United States v. Neifert-White,* 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968). It would not appear consistent with the Congressional purpose to bar false claim actions brought on behalf of the government when the relator possesses *original* information which he has voluntarily turned over to the United States prior to commencing suit and the government declines to act to protect the public treasury.

In contrast with the policy of section 232(C) to limit suits not based on original information, the policy underlying the principal section of the False Claims Act, section 231, is to protect the United States Treasury from all manner of fraudulent claims. The Supreme Court has recently held that the False Claims Act is to be liberally construed to further the policy of compensating the United States for fraudulent claims. The present construction of section 232(C) urged by defendants is contrary to this general policy as it would defeat recovery by the United States for the false Medicaid claims alleged in this action. The Supreme Court in *United States v. Neifert-White,* 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) examined the legislative history of the Act and stated:

"Debates at the time suggest that the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government. In its present form the Act is broadly phrased to reach any person who makes or causes to be made 'any claim upon or against' the United States. . . . *In the various contexts in which questions of the proper construction of the Act have been presented, the Court has consistently refused to accept a rigid, restrictive reading, even at the time when the statute imposed criminal sanctions as well as civil.* See, e.g., *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943)." (emphasis added). 390 U.S. at 232, 88 S.Ct. at 962.

This court would not be adopting a liberal construction of the False Claims Act as required by the Supreme Court if the court were to bar the instant action by determining that the State of California was an "agency" of the United States within the meaning of section 232(C). No cases have held that the term "agency" of the United States was intended to apply to state governments or their subdivisions; as previously noted, typical agencies have included the United States Army Quartermaster Corps, the United States Army Signal Corps, and the United States Justice Department. Ordinary usage of the designation "agency" of the United States would not appear to contemplate application to a state government and its subdivisions but rather would appear more appropriately limited to true federal entities such as the United States Army and United States Justice Department. In *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), a case which did involve claims submitted through a local non-federal agency, the Court did not characterize the local public works program as an "agency" of the United States for purposes of the False Claims Act although such a determination was a possible means of resolution of the case. Despite the surface plausibility of defendants' contention regarding consistency in evaluating claims against the United States under section 231 and the "agency" limitation of section 232(C), the court finds that a determination as to claims being "against the United States" does not compel a finding that the local subdivision through which the claims are submitted is an "agency" of the United States under section 232(C).

This court concludes in light of the legislative history of section 232(C), the cases which have applied that section and the Supreme Court's recent pronouncement in *United States v. Neifert-White* in favor of

liberal construction, that the State of California by virtue of its participation in the federal Medicaid program is not an "agency" of the United States within the meaning of section 232(C) of the False Claims Act. No evidence has been presented here that the United States government was previously in possession of any evidence relative to the instant alleged false Medicaid claims. The merits of the present controversy have never been considered and the parties should have the opportunity, following discovery, to fully and fairly litigate the existence of the alleged fraudulent claims.

## DOE ALLEGATIONS AND MOTIONS FOR MORE DEFINITE STATEMENT

In the complaint, plaintiff attempts to name as additional defendants Does I through V, inclusive. The defendants here move to strike these Doe allegations. The pleading of fictitious parties is not permitted by the Federal Rules of Civil Procedure. (See *Green v. United States,* 385 F.Supp. 641, 642 (S.D.Cal.1974) and cases cited therein). Accordingly, defendants' motion to strike fictitious parties will be granted.

The defendants additionally move for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) on the ground that the original complaint fails to allege fraud with sufficient particularity. As plaintiff has expressed an intention to file an amended complaint to cure possible defects in this regard, this motion will be taken under submission pending the filing of plaintiff's amended complaint.

## CONCLUSION

State medical assistance programs funded through the Medicaid Act (42 U.S.C. § 1396 et seq.), such as MediCal (California Welfare and Institutions Code section 14000 et seq.), are subject to extensive federal regulations which govern virtually all aspects of the state programs. A substantial percentage of monies paid to claimants under these state programs originate with the federal government. Under these circumstances the court is persuaded that claims filed with state Medicaid programs are claims against the United States government within the meaning of the Federal False Claims Act,

31 U.S.C. § 231 et seq. This conclusion is consistent with the policy behind the False Claims Act. The Supreme Court has indicated that the purpose of the Act is "to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." (*United States ex rel. Marcus v. Hess,* 317 U.S. 537, 544–545, 63 S.Ct. 379, 384, 87 L.Ed. 443, 449 (1943)). The defendants' motions to dismiss based on the absence of a claim against the United States, therefore, are hereby denied.

The court determines that the State of California acting through its Medicaid program and Attorney General is not an "agency" of the United States within the meaning of 31 U.S.C. § 232(C), and, accordingly, the defendants' motions to dismiss based on lack of jurisdiction under section 232(C) are also denied. The defendants' motions to strike Doe allegations in the complaint though are well taken and are hereby granted. The defendants' motions for more definite statement will be taken under submission pending the filing of plaintiff's amended complaint.